On behalf of Mr. Gonzalez, Mr. Jeffries, and Ms. Kirkham, on behalf of the state, I am very grateful. Mr. Kirkham, you may proceed. May it please the court and counsel, good morning, your honors. The Fourth Amendment does not permit a pretextual search of a house. And that's what we have in this case, a pretextual search of a house. Investigator Lindley received information from what he terms to be a reliable informant that the person who lived at an address in Aurora was in the country legally and there were large amounts of narcotics at the house. They conducted surveillance over a period of time, including one day when they saw the defendant leave and drive his car, they took no action that day. And then on August 4th of 2014, Investigator Lindley and other officers followed Mr. Contreras. He went to a Wendy's drive-thru, then drove to a BP gas station where he went inside, and then headed back toward the location of the house where he had left earlier. Well, why wasn't this a reasonable traffic stop followed by what the officer saw in plain view that then led to the search? Fourth Amendment law is clear that when an officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred. Such conduct is presumptively unreasonable without warrant. Well, where did they intrude? I mean, they stopped him right at this gate, right? Yes. But then when they were at the gate, they were able to see the little corners of the baggies in plain view and then requested to search the house. When that was refused, they got a warrant. Right. And then when they were walking from the back door to the front door, they were able to look into the window again in plain view. So where was the intrusion on the curtilage? I mean, wouldn't anybody walk that same path? Wouldn't the general public be able to walk that same path? That's a whole lot of questions right there. Exactly. Take one at a time. Let me start here with plain view. In order for an officer to legally view items in plain view, he has to be in that position legally. Investigator Lindley was not in the curtilage of the house legally when he observed the baggies and in the front window of the house. All right. So in answering that, and I think this also adds to Justice Zinoff's issue, at what precise point do you believe this became pretextual? Okay. Pretextual stops of automobiles are permissible. It became illegal in this case where the basis of the traffic stop, failure to use a turn signal, occurred two blocks away from the residence. The officers followed that two blocks, waited until he arrived home, and Lindley's testimony is not precise. It varies a little bit, but the only takeaway from it is that the defendant had already pulled into the driveway or was pulling into the driveway when the pretextual stop was effectuated. The stop could have been done in that two blocks after the traffic violation before he pulled inside his privacy fence and was present on the curtilage of his own home. But they had another issue that they were concerned about, and they had a person along with them, or I can't remember if Bonk was riding with them or he was in his own vehicle, but he's interested in a person who is not in this country legally. So do they have to do some verification? Does that take two blocks? Or should they just have stopped him right then, and if he was not the person they thought that was illegal, then they have another problem? I don't recall any part of the record that talks about what the officers tried to ascertain about the defendant during that two block period. I don't think there was much. No. Well, so, but then how do we, I mean, how must we assume that an officer can't do, I mean, we know they have computers and they look at license plates. I mean, how would Justice Hutchinson's inference, let's say, be wrong? I mean, what would tell us that the police have to arrest somebody immediately and couldn't wait two blocks? I mean, isn't the motivation, the motivations of the police really irrelevant when they make a reasonable traffic stop or they see a violation? I think it's very important, and we need to distinguish and separate traffic stops and searches of homes. Traffic stops all flow from the automobile exception, which goes back to 1925 in Carroll, and all of that is rooted in the ready mobility of vehicles and the pervasive regulation of vehicles. The Fourth Amendment cases are clear that that is separate from searches of homes. Okay. Curtilage is considered to be part of the home. Right. Outside is just the same as being in the living room. Okay. Okay. A warrantless search of a home is per se intentional, absent exigent circumstances or hot pursuit. Okay. We had neither of those conditions in this case. So to gain access to the curtilage of a home, there either had to be a warrant or some type of recognized exception to the warrant requirement. Okay. You can't take a pretentious traffic stop and expand the scope of something that's rooted in the automobile exception and carve out a new exception to home searches, and that's what they're trying to do here. Well, that's not what the testimony and facts were. The facts were, yes, they did stop him. The discrepancy seems to be when he turned on his lights, whether it was before he pulled into the driveway or as he pulled into the driveway, and you're not really addressing that at this point, but the fact remains when he pulled into the driveway and got almost into that secure fence area, he was stopped. He never got out of the car. He was asked, by the way, and he brought out an ID and then was asked, anybody else in the house? And for officer safety, he immediately knocked on the door that he could see right there within the fence area, and nobody answered, so then he walked around to the front. What's wrong with making, and he said that was for officer safety. Allegedly, they didn't want to be there and during a traffic stop be surprised by somebody in the house. What's wrong with that process after the traffic stop? Well, what's wrong with that process after the traffic stop is that it all flows from the illegal entry onto the curtilage. The manipulation of the traffic stop to gain access to the curtilage constituted an illegal search of the house. Everything that flowed from that point on is the fruit of the poisonous tree, the poisonous tree being the illegal entry onto the curtilage. Mr. Contreras could have stopped his car before he hit that security gate, but he went into the security area. I'm not sure that that's supported by the facts. Well, there's a gated area as you get in. There is a gate that could have been closed. I think the facts would identify or some way to get that car totally in. He pulled three-quarters of the way into that area. If they want to talk to him, how are they going to talk to him? Well, they manipulated the potential traffic stop. Well, why didn't he stop as he turned in? We see lots of cars that stop just when they turn in the driveway. He's returning home. He parks inside that. The gates were open. It's perfectly natural and normal, it would seem, for a person who's returning home to pull in the driveway and proceed up to his usual parking spot. It's unclear exactly when the officer in an unmarked police vehicle turned on his lights. I think the police report in his initial testimony was, I pulled in behind him and then I turned on my lights. But his report said otherwise, I think. It's one or the other, but I think his report said he turned it on as he was on the street as Mr. Contreras started to turn. In any event, it occurred when Mr. Contreras arrived back at his residence. Correct. I don't know how it could be unreasonable for Mr. Contreras to not pull into through his privacy. I get that. But you're saying it's all pretextual on this traffic stop. I had not been able to find any case that says the minute Officer Monday sees somebody commit a traffic offense, they must stop them right then or try to stop them right then. If you have a case like that, I'm happy to look at it. I don't have a case like that. But you can't wait until he returns home and pulls inside a privacy fence to effectuate the pretext. You have a case that says that. I don't. Okay. And this would be the case that says that if the court finds... Why should we find that a traffic stop in which the officer is entitled to get identification and, I believe, check for insurance, is supposedly illegally in a curtilage because that happens to be where the defendant is? It's one thing to talk about pretexts. There's case law that I'm aware of that says that pretext may, quote-unquote, suppress or result in the nonconviction of a traffic offense, but it doesn't alter probable cause if, in fact, there's probable cause based upon the observation of the traffic violation. The case I'm referring to, I don't know the name, but it related to a situation where a driver came to a T intersection and didn't turn his turn signal on to indicate whether he was going to go left or right. And it was claimed that the stop, because he failed to turn on his traffic signal, was pretextual. And the Supreme Court said no. It may be a basis for finding the defendant not guilty, but the police officer had a reasonable basis. He saw a technical crime being committed, and, therefore, the stop was not improper. You haven't indicated that the police officer didn't have a reasonable basis to make the stop, and, therefore, you don't have any basis to claim that the officer's presence was illegal. And that seems to be your argument, because you start out from the very beginning suggesting that when he went on the premises, it was illegal. And I'm suggesting to you that when he went on the premises, he was going there to determine the identity of the defendant, get an ID, confirm whether or not he's legal or illegal, and also, if he wants to, ask for an insurance card. Whether or not he then starts breaching or going beyond the scope of this, and whether or not he now, quote, unquote, looks in areas that privacy concerns may be inviolate, that's a different argument. But you're not making that argument. Do you want to make that argument? The argument I want to make is that the police should not be allowed to manipulate the location of a pretextual traffic stop. How did they manipulate it? They didn't. He returned all the way home. There were two blocks. I mean, what is the limit? How far can you follow someone before you pull them over if what you want is access to that person's home? This was an investigation of a tip of narcotics in the home. And the officer manipulated the traffic stop to gain access to the curtilage of the home to further that investigation. The statement, or I should say the term manipulation, seems rather extreme. I would suggest fortuitous, serendipitous might be more appropriate, because I haven't seen in this record anything to indicate that they had any control about where he decided to drive until such time as they attempted to restrain him or seize him as it were a traffic stop. And therefore, as I believe Justice Hutchinson was referring to, he was the one who decided where he was going to stop. They didn't decide it because he could have gone to a third place for all they know. He could have driven around the block to see if he was being followed. So when you say manipulated, there's not really much evidence to show that there was a manipulation. There's evidence to show that it was fortuitous and what they hoped might happen happened, but that doesn't necessarily mean that they're controlling the scenario. You can reasonably or respectfully disagree, but I was hoping for a refutation or a rebuttal. Well, I'm not sure how I can refute your contention that it's okay to follow a suspect who's driving a vehicle after he commits a traffic violation until he fortuitously arrives at his home, which is where you want to be to make plain view observations. Well, I'm not going to make a public policy statement because I don't have to, but I will tell you this. There have been instances where the best time to make a traffic stop is after the defendant has stopped rather than attempting to pull them over because pulling them over isn't always successful. But if they're stopped and they're stopped in their driveway, and especially if you pull in behind them, it tends to make them stay where they're at unless, of course, they're going to bash the hell out of the squad car. I mean, frankly, my argument depends on being able to convince you that this stop was improper, that it was manipulated or fortuitous or controlled to the point where it caused the officer to conduct the stop. Go ahead and finish that thought. I lost my train of thought. I'm sorry. Here's if I can have just one quick moment. I encourage you all to read Collins v. Virginia. I know I rely upon that heavily in my brief. It's not right on point, but it's very instructive. The United States Supreme Court very recently was forced to examine this intersection of automobile searches and exceptions of the Fourth Amendment that stem from those automobile exemptions. When that meets up and clashes against protections of the home and the curtilage, the Supreme Court, 8-1, came down very strongly of protecting the home and the primacy of protection of the home at the expense of the automobile exception. It reversed the conviction and said that was an improper invasion of the curtilage. I contend that that's what happened here. The police officer conducted a warrantless search of the house based on his timing of the traffic stop. When you say this is what this case could do, this case could say two blocks is too many, how can I, I mean, maybe two miles might be too many. Two hundred miles, I would say is probably too many to follow. But how can we say reasonably that two blocks is too far to follow someone, especially knowing what they knew or thought they knew and what they were looking for? If I can continue. I know I'm way over time. You can answer the question, but I don't know about continuing. So the pretextual traffic stop at the automobile exceptions arise when the police officers are interested in the car or the person who's moving out on the road. I don't think that it's a stressful saying in this case that the object of the police interest was the home, in addition to the defendant, but primarily the home. At one point, Lindley says, we just wanted to get on with this investigation, and so we made the stop. Okay. That distinguishes this case from those pretextual stops where it is two blocks too much. Well, two blocks may not be too much when the objective and the pretext is to find out what's in the trunk of the car. But when you go two blocks and wait until the defendant is in the curtilage of his home and make the stop, it becomes unreasonable. So you would have been okay – well, I'm not going to make you commit to this, but it might have been okay for them to say, okay, let me see your ID, which they did, and found out that, in fact, he was in this country illegally after being deported, and then they could have opened his trunk. And if he had the drugs in there, we're done. Well, there would have been probable cause. Well, we're searching it. Can't you go down that whole line? Okay. All right. All right. We would ask that you reverse the finding of the trunk for refusing to suppress the evidence in this case and reverse the circuit of choice. Thank you. You'll have an opportunity to make your bubble. Mr. Jacobs, you may proceed. Good morning, Your Honors. May it please the Court and Counsel. Your Honors, the defendant here fails to demonstrate that Officer Lindley's conduct of stopping this defendant after observing a traffic violation was either unreasonable or that his subsequent conduct after the stop constituted warrantless search in violation of the Fourth Amendment. The traffic stop is clearly supported by articulable suspicion. Officer Lindley testified at the hearing on a motion to suppress that he observed numerous violations, and then as the defendant, I don't recall the exact street names, but as he approached Plum, Plum and Harrison. Plum and Harrison. There's a Plum in there. Thank you. The defendant made a left turn and did not use his turn signal and made an almost immediate turn on a short block and then turned another left into his driveway, and Officer Lindley effected a stop immediately upon that vehicle as it pulled into the driveway. Well, no, no. It wasn't immediately. As it pulled into the driveway. Right. But counsel's argument is that they waited two blocks after seeing the violation to effectuate the stop. That's his issue with this. What is your response to that? That there's nothing in the record that would suggest that this stop was manipulated by the police. This just occurred there. They waited. He traveled, was traveling. He committed the violation or they observed the violation. He traveled a short block, turned left, and then turned left into the house, which was, I think, the second from the corner. So this was happening around the time frame. I did not mean to suggest that he immediately stopped. However, it was as soon as practical as he pulled into the driveway. Well, again, that's counsel's argument is that it was pretextual that they could have stopped him sooner and that their real motivation was waiting until he actually got through that privacy gate so that they would have a reason to eventually get into the house. Yes, and as Your Honor recognized, there's no authority suggesting that this was this protection. It was pretextual that this was improper on the part of the officer to wait. There's no authority that I was able to locate that would require the police to immediately stop, although in this case they didn't stop as soon as practical. Well, I think that's the issue. We have all sat on trial courts where we have heard, and you have all seen records where you have seen, that the police say, well, after we saw the violation, number one, we had to run the license plate, and number two, we had to check the general identity of the driver to see if there are any outstanding warrants. We don't have that testimony here, but I think, just as Enoff said, we're familiar with it. Does that familiarity solve the problem, or should there have been testimony that, you know, once we saw this, we did this, we did this, we did this in the car, and then we stopped him? Again, I don't believe that the law requires or finds relevant the motivations of the police, and that would get to the motivation of what the police were doing as to whether or not it's pretextual. The fact is there is a reasonable suspicion based upon what they had observed. They stopped the vehicle as soon as practicable, falling behind it, and the claim that they somehow manipulated the location of the stop simply not supported by the record. Officer Lindley could not have known where this event would stop this car as he pulled in behind it, that it could have stopped behind the gate. Well, I've seen pictures of the general outside of the house, and it looks like the gated area sort of starts at the front of the house so that the total back might be covered. There is some driveway before you get into that gated area. There was places he could have stopped before he hit that gated area, correct? Correct, or he could have pulled beyond the gated area, got out of the car, and shut the gates, in which case the only alternative would have been to seek a warrant at that point. That's where he was so inclined. But the fact that he pulled into the open gates, and they were not closed, obviously he wouldn't have been able to pull in, defeats the argument that he had some sort of expectation of privacy in this area, that it was not an implied license at least for anybody arriving on that driveway to walk up to the driveway and observe that side door, if not enter that side door, or not. Well, it actually looked like, although I didn't see the car there at the point, it looked like that where they were talking was pretty close to where that door was, so if the defendant had gotten out of the car, he might have been able to walk in that door without going significantly right or significantly left. That appeared as I viewed it. As it correctly observed here, there simply isn't any, can I say, there simply isn't any known precedent that supports the defendant's position that the police could not wait to effect this stop after making the observation of him not using his turn signal. I'd also point out that the trial court found Inspector Lindley's testimony wholly credible on this issue and did not believe that this was a pretext. There are some other interesting type facts. The officer said that he was checking for officer safety. He asked the defendant, anybody else in the house? No. But he wanted to be sure, at least that's what he said. When nobody answered the side door, he went around the front and there looks like there's a walkway. I don't know if it was concrete or stone. It looks like a walkway that goes to the front door. He said that the blinds were, there was no screen and the blinds were actually partially out, but they were up. Later we see the blinds down. Do we have any explanation for that? There was no explanation given by Inspector Lindley. He did maintain that he, when he was walking a direct path from the driveway to that front door, he saw these blinds, I think, halfway up and the window screen missing. But there's no explanation that I could find in the record. He denied that he had. He applied for a warrant on the basis that he saw white powder, scissors and plastic bags in the kitchen that he had. In part, yes. And when they executed the search warrant, was his observation corroborated and established by the fact that they actually found a white powder bag and scissors on the kitchen table? He indicated that he did find a white powder. The photographic evidence, which I believe is People's Exhibit No. 11, shows a So unless he's prescient, he saw what he saw, based upon what he supposedly testified to thereafter. Correct. And the photographic evidence does at least corroborate that. It's difficult to see. It's a very cluttered table with beer bottles. I believe that the exhibit does have a circle which was designated as white powder that was observed. But I think in his testimony, he also remarked that he had removed the baggie of white powder before he photographed the table. If your honors are in line, I can talk more about the cartilage. Well, I know he said he walked directly. But as I remember that picture, there is a walkway. And then, I don't know, as a gardener, I look to see where you can plant stuff. And it looks like there is some space in front of the window where something could be planted, but nothing was planted. How wide is that space? He testified that he buck-hooked around the gate and walked a distance of between 9 and 12 inches from the structure to what is a stoop. It's not a porch. It's a front stoop where you would enter or exit the home. I'm not exactly certain how wide. My recollection of the picture is that the lawn runs. There may have been landscaping at one point. Well, it wasn't until the day the picture was taken. But there is some space between the house and the walkway. It is an unprotected space. Again, an open window with a window missing the screen with the blinds up. Any invitee could observe the same who, as I said, would park on that driveway and approach the front door. It is not reasonable to believe that all invitees would backtrack down the driveway and come around and go to the front and walk. So this is a little bit different than the traditional license, which is mentioned a lot in Hardeen's. But certainly there's nothing in the area of the window that would obstruct a plain view observation. And again, the trial court here found Inspector Lindley's testimony about the plain view observations that he made to be wholly credible. How do you, if you do, disagree with counsel's syllogism that, based upon a pretext, the police officers were in violation at the instance they entered the curtilage? That is not borne out by the case law, which allows certain exceptions to this idea of curtilage. Obviously the police in hot pursuit can come upon the curtilage. I believe we both mentioned the Scheer case, or both sides mentioned the Scheer case, which was not troubling to long ago at the Supreme Court when officers had a confidential informant tip that a vehicle was traveling with alcohol. They followed it into, actually into the garage of the driveway. And the court was not troubled by the fact that the officers walked upon the curtilage of this home. So there are, another example would be the knock and talk. I mean, it's not truly an exception, but a police officer can, just like any other invitee or person exercising their traditional license, can walk up to the front door, can walk on the driveway, walk on pathways without writing the Fourth Amendment. So it's the State's position that when they were on the driveway, this didn't necessarily invade the curtilage. And if it did, it was not a, that there is some exception to that. Were the baggies capable of being seen even if the gate was closed? Do we know? There's no testimony directly to cover that. It's a six-foot privacy fence, so I'm assuming that it would be difficult without approaching the door to see those baggy corners. We're supposed to resolve or determine the ultimate issue, whether or not this was kosher via de novo review. So I would like to hear your summation, your rationale for why we on de novo review should defer the trial court. As I stated, the record doesn't support a contrary finding in this case. Officer Lindley clearly had reasonable suspicion to stop the vehicle. He was not required to stop it on the street, or he stopped it as soon as practical. And as Your Honor indicated, it's fortuitous that the defendant pulled forward to effect this stop and to continue the investigation into the fact that the data report that the defendant was in the country illegally. They approached this defendant and requested his card and actually corroborated that informant's tip. I guess I'm giving a summary, so I've got lots to say. The conduct of Inspector Lindley following the stop was also reasonable. He approached the side door to confirm that no one was present as a concern for officer safety. And when no one answered, he approached the front door. He made the observations as he approached the front door of the father. Excuse me. So there's nothing contrary, factually, that this Court could say was improper. And the defendant refused a search of the premises, and so a warrant was sought and obtained. Yes. And a judge approved the issuance of the warrant. Thank you for continuing the summary, yes. Yes, this all was done with a valid warrant. Where was the defendant while they were going to get the warrant? I believe he was transported at that time. I couldn't tell from the record if he went right away or if they waited there with him. My recollection is that he was not present when the search was conducted. He had already been transported, which gets to the statements he made later being sufficiently attenuated from the primary, if there was a reality, that they were at least attenuated. Are there any questions? If there are no questions, thank you very much. I would ask that you refer the trial to us. Thank you. Thank you. Mr. Kirkham, you may proceed. Thank you, Your Honors. If you all have a copy of my brief, I did include in the appendix to that on page A-10 a copy. I believe it's People's Exhibit No. 1, which is the street view of the house. It kind of puts things in perspective. It's easier to follow when you've got the picture in front of you as opposed to— But the fence starts kind of at the front end of the house, maybe not exactly at the front end, but it's really pretty close to that, correct? It does. It appears it's almost anchored to the front corner of the house there, yes. I didn't know how it got there, but I thought that's about where it was. Yeah, that's correct. And so to talk to the driver, assuming that's what they wanted to do first, they either had to go in to where he was or call him out. Is there any authority that they had to call him out to talk to him under these circumstances? If it's a legal stop up there in the current location, yes, he can walk up to the driver's window and speak with him through that window. But that window puts him inside that security fence. Yeah, I think the testimony from Investigator Lindley was that he was about three-quarters of the way past where the gate would be if it was closed, which put his driver's window straight across from the side door of the house. So if he were going to get out of the car, he'd open the door, shut the door, and go. He wouldn't have to go to the right. He wouldn't have to go to the left. He could pretty much navigate directly. If he was going to leave his car in the plane of the privacy fence. And did he ever attempt to move the car forward? Do we know why he stopped the car where he did? Maybe that's the issue. We don't. I mean, I can't say why he didn't pull up further or stop and put his holder out on the street. The other thing I'd like to point out is there's been some talk about, you know, what might have occurred on the part of the police in that two blocks running the license plate and so forth for doing some kind of preliminary investigation through their communication system. If you look at the affidavit for the search warrant, Professor David Lilly talks in there about following the same car and the same driver several days earlier, running the plate, getting all of that information on a prior day, three or four days before this. Same driver, same car. They knew all this information when he backed out of the driveway during the entire time that they followed him to the Wendy's and the BP and back home. So I think the record rebuts any inference that they used that two-block period to conduct plate checks and so forth. We've heard a lot of these cases that relate to a car that might be suspected of dealing or dealing from a car, and it seems like they, so many of these cases go to fast food restaurants and gas stations, and that's exactly where he went, correct? Yes. Why then, I mean, I'm trying to understand why I can say two blocks is too far when they know the same things we know or that they've told us the same things we now know, that these two places are hot spots for these things? Well, you know, there's plenty of observations in cases, and I think I cite one in my brief, where an officer who wants to conduct a potential stop on a car doesn't have to look for very long to find a basis to make a stop. So they didn't find anything between home and Wendy's. They didn't find anything between Wendy's and BP. But two blocks from his house they managed to see, and that was a turn signal. Are you suggesting that there were multiple violations of the vehicle code, but these police officers only remember the one that was two blocks from the house? Well, I think that the record supports a version of what you just said. The affidavit says he observed several traffic offenses. I think Investigator Lindley started talking about, in his testimony, the suppression hearing more than one, and then he ended up in a place where he said, well, the one I recall most vividly, or whatever his words were, was the one at Plum and Harrison, the middle turn signal, and that's the one we decided to act on. He backpedaled down to just one traffic violation by the time the suppression hearing was over, even though he put in this affidavit that there were several traffic violations. Any other questions? If there are no more questions, we'll ask Director English. Thank you. We have other cases on the call.